## CROBAUGH, KIMMEL & CASLER v STATE

Ohio Appeals, 8th Dist, Cuyahoga Co

No 12565. Decided August 3, 1932

Day & Day, McKeehan, Merrick, Arter & Stewart, and G. W. Cottrell, Cleveland, for plaintiff in error Crobaugh.

McGowan, Foote, Bushnell & Burgess, Cleveland, for plaintiff in error Kimmel.

Boyd, Brooks & Wickham and Ben B. Wickham, Cleveland, for plaintiff in error Casler.

P. L. A. Lieghley and Emerich B. Freed, Cleveland, for defendant in error.

FARR, J (7th Dist), MAUCK and MIDDLETON, JJ (4th Dist), sitting

MAUCK, J.

One of the last questions raised by the record, but one of the first questions in the orderly consideration of the case, relates to the sufficiency of the indictment. The in-

dictment was returned under favor of §13175 GC. It seems to us sound, as argued by the plaintiffs in error, that the indictment does not charge defendants with making a false statement with an intention to deceive any one with relation to the property of the corporation or with relation to the value of the corporation's property. But it does appear to us that the indictment charges an offense when it charges that the defendants made a statement relating to the business methods of the mortgage company. The section referred to may be reduced to the following terms:

"Whoever knowingly * * * publishes * * * a * * * statement * * * of or concerning the affairs * * * of a corporation * * * containing a statement which is false' or wilfully exaggerated and intended to deceive any person as to the real value of any * * * bonds * * * of said corporation * * * shall be fined," etc.

The false statement charged against the defendants was that the company's "affairs" were such that the bonds that it was proposing to sell on the partial payment plan were then existent and were then secured by collateral. The term "affairs" covers the business and business methods of the corporation, and the statement attributed to the defendants thus undertook to describe a method by which the company's business was handled which, if true, would have given to the bonds it proposed to sell a greater value, because those bonds were secured by collateral, than they actually had because they were wholly unsecured. That the bonds were not in existence at this time does not avoid the fact that purchasers may have been deceived into paying their money on the purchase of what they thought to be a secured bond. Upon the theory, therefore, that the alleged false statement in the indictment related to the company's methods of doing business, and therefore to the company's "affairs" we conclude that the indictment was sufficient.

A second question argued with much vigor is that the defendants were entitled to a directed verdict because of a failure of proof of some of the essentials of the case. Assuming the indictment to be good, as we view it there is but one phase of the case that would have justified the court in entering judgment for the defendants. It is a serious question whether the evidence in the case showed that the defendants or others "did sell to the general public first mortgage collateral trust gold bonds on the partial payment plan." It is true that the corporation took subscriptions and received money in partial payment for bonds to be

thereafter delivered to the subscribers subject to certain defined conditions. The purchase of securities by the partial payment plan clearly comes within the provisions of the bond investment law, §§697-709 and 13151 GC, and that the defendants violated the last named section cannot be doubted. As the question has not been pressed in this proceeding, however, and as some of the representations of the salesmen operating under these defendants seem to treat the transaction as a bond sale, we with some hesitation hold that these partial payments were installments on a bond sale and that the alleged false statement ran to the value of a bond thus being sold notwithstanding there was no bond to be sold. With this question so resolved in favor of the state, the trial court did not err in refusing to direct a verdict for the defendants.

We further conclude that the verdict is not against the weight of the evidence. The multifarious charges upon which the defendants were tried make it impossible to reach any satisfactory conclusion upon the weight of the evidence. The indictment covers any statement made by the defendants or any of them in person or by agent, in writing or orally, over a period of more than four years, and there is nothing in the record to indicate on what statement the defendants were found guilty or whom or when they sought to deceive. The record tends to show, if any, not one but scores of offenses by some one or more of the defendants, so that it is possible that one juror may have found the accused guilty of publishing statement A with eleven jurors dissenting; a second may have found the accused guilty of making statement B with eleven jurors dissenting, and thus in the end the general verdict of guilty may not have expressed the unanimous mind of the jury upon any particular statement. Under the familiar rules that limit us in considering the weight of the evidence, we are unable to say that all the literature plus the authorized statements of some salesman could not be found to be false as to the company's affairs and may not have been made with intent to deceive some one.

Complaint is made that the court erred to the prejudice of the plaintiffs in error both in the admission and rejection of testimony. We rather think that there is some error of this kind. It would be strange in a record of two thousand pages if such error did not intervene. We are of the view that such irregularities of this sort as occurred are not of such a character as would justify reversing the judgment.

1. When Mr. Crobaugh became identified with The Union Mortgage Co., in 1923, the company was making contracts with its sub-

scribers on blank forms which contained what has been known in this case as the "will retain possession" clause. The language of this clause was as follows:

"The Union Mortgage Company will retain possession of said bonds and will deliver same to purchaser when payments under this agreement have been completed."

Inasmuch as the subscriber was making partial payments on a bond that had no existence until issued, and which could not be issued until paid for, this clause was deceptive to those not given to the analysis of such documents. The "will retain possession" expression implied that the actually non-existent bonds were somehow then in the possession of the company and coupled with other literature doubtless enabled salesmen to delude subscribers into the belief that a bond had been allocated to the subscriber and had been secured by collateral deposit. It is to be said to the credit of Mr. Crobaugh that he disapproved this form of contract and caused another to be prepared, in which other form the misleading phrase was omitted and other language used that expressly disclosed that the contemplated bond had not been issued. The old form of subscription contract, however, was sometimes used by salesmen after the new form had been approved by the directors of the company, and as there is no question that all of the defendants knew of the equivocal nature of the "will retain possession" form of contract, the state asserted a right to a conviction solely predicated upon the use of this document. The effect of the use of this form of contract became so large a question in the case that the defendants sought by special charge B to have the jury instructed that the use of this particular document "of and by itself" was not sufficient proof that the defendants made the statement pleaded in the first count of the indictment. The court refused to give this instruction or any equivalent therefor. The result was that this case went to the jury under the view that proof of the use of this form of contract was sufficient proof that defendants made a false statement with regard to the value of the bonds being sold. This was manifest error. The "will retain possession" expression is nowhere near the false statement pleaded in the first count of the indictment. Failure to give this instruction was such error as requires a reversal of the judgment.

2. As above indicated, the "will retain possession" clause was in use by the company before Mr. Crobaugh became connected with it, at which time the officers and agents of the company were employing other literature of an equivocal character and sales were being made by the representatives of salesmen tending to show, in some degree, that the partial payments were secured by collateral. The state claimed that the united efforts of the various representatives of the company to this end amounted to a conspiracy and that when Crobaugh became an officer of the company he became one of the conspirators. On this phase of the case the court charged:

"The state must prove beyond a reasonable doubt that such conspiracy existed prior to the time when Crobaugh joined said company. If it has so established such conspiracy, and you find that Crobaugh after becoming such officer of such corporation aided and abetted the same and assisted in carrying it out, then in law the declarations of all those who originated the conspiracy and carried it on before he became an officer of the company are applicable to him as well as to the originators thereof."

There was no question in the case that Mr. Crobaugh was an active officer of the company and actively promoted its business and assisted in securing new business and new subscribers for the corporate securities. The error in the charge is apparent. Mr. Crobaugh did not become a part of the conspiracy, if such there was, by reason of any innocent acts that he did. He could only have become a conspirator by knowing that there was a conspiracy and by doing something which he knew would promote the wrongful purpose for which the conspiracy had been organized. The quoted charge was erroneous in not making this necessary qualification.

3. Another impressive assignment of error relates to the court's charge upon intent. Upon this subject, which was a vital phase of the case, the court charged at length in both the special instructions and in the general charge to the jury. Most of what was said to the jury in both the special and general instructions was beyond criticism. It was vital, however, to the defense that all that was said to the jury in this behalf be in harmony with the law. The equivocal nature of the literature issued by the mortgage company and the forthright misrepresentations imputed to the salesmen made a strong case of negligence against all of the defendants, from which they were not relieved even by their own testimony. It was of extreme importance, therefore, that they should not be judged by the jury solely upon the representations made but by the innocent or evil intentions that inspired these statements. In some cases the

law raises a presumption of an evil intent from the evil consequences that flow from a wrongful act. The trial court applied that rule to the instant case and said:

"Therefore the law has established, the following rule with relation to intent, namely: All persons are presumed to have intended the natural and probable consequences of their voluntary acts. If the natural and probable consequences of the acts proved by the state to have been done by the defendants were to deceive and mislead then they are presumed in law to have intended those consequences."

This instruction was erroneous in that it advised the jury that a legal presumption arose that the defendants were moved by an intent to deceive if in fact the result was that some one was deceived. Hibbard v United States, 172 Fed. 66. **Searles v State, 6 O. C. C., 331.** This error was aggravated and intensified later in the general charge. There the court after properly saying that the state must satisfy the jury beyond a reasonable doubt that the intent was to deceive erroneously added this sentence:

"All the state has to prove are acts, the natural and probable consequences of which are to deceive."

The vice of this instruction was, first, that it evaded the province of the jury by telling the jury that quantum of evidence was conclusive proof of guilt, and the second vice was that the quantum so fixed was erroneous, for the reason that the consequences of the false statement made, if any, may have resulted in just as unhappy consequences though innocently made as if made with the full purpose of deceiving.

The instructions in the particulars referred to were both erroneous and prejudicial. The importance of this phase of the case is emphasized by the fact that after retiring the jury asked the judge to advise them what was said by him with relation to intent. The record shows that the jury had the special instructions relating to intent, which dealt with the question in an unexceptional manner, but from their inquiry they indicated their confusion over what the judge had said in the general charge, which the jury did not have with it and which differed from the special charges substantially only in the respects discussed herein.

4. It is further claimed that the then prosecuting attorney was guilty of misconduct in his argument to the jury. With this contention we fully agree. All the criticisms in that respect are well directed. We shall, however, refer to but one instance. The prosecuting attorney in his argument to the jury urging conviction told the jury, that if it found a verdict of guilty and the trial judge did not agree therewith a new trial might be granted the defendants, and in substance that if reviewing courts did not agree with the verdict that the same might be set aside and the defendants restored to their rights. This appears from an extended colloquy participated in by the prosecuting attorney, one of the attorneys for the defense and the trial judge. From this colloquy it appears that counsel for the defendants were attempting to object to the whole line of argument and that the court at first doubted whether the argument of the prosecuting attorney was proper because he said that the prosecuting attorney was arguing the law. It further appears that the argument was continued over the objection and subject to the exceptions of defendants. The argument was improper not merely because it related to the law but because it was a misstatement of the law. It was an invitation to the jury to shed some of its responsibility and console itself for any mistake it might make in returning a verdict of guilty by the thought that the trial court or a reviewing court which did not agree with the jury was at perfect liberty to substitute another judgment for the jury's judgment. This, of course, is not the law and was an invitation to the jury to perform its duties with a lesser sense of responsibility than it would have if it realized that its finding upon the facts could only be disturbed when either the trial judge or some reviewing court found the verdict to be manifestly wrong. It was prejudicial error for the court to permit this argument and loan it approval.

5. The case was submitted to the jury on December 2. On the afternoon of December 3rd the jury had made the special request to the judge for information as to the general charge on intent. On the afternoon of December 4th the jury was brought into court on motion of the court and asked of the probability of its agreeing. Thereupon the foreman asked that the court's charge upon intent be again read to them. This was done. Thereupon the foreman inquired of the court as follows:

"Is it necessary to bring back verdicts on all three defendants?"

The court answered: "Yes, you may return now."

An extended colloquy followed but in answer to the jury's request the court never

instructed it except that there was nothing compulsory about its returning a verdict. Defendant's counsel insisted upon the jury being advised that it might return a verdict as to one or more of the defendants without reaching an agreement as to all the defendants. This the trial court refused. He gave as his reason that he had already advised the jury along this line in the general charge. This was a mistake. He had not done so. It is clear enough that the jury wanted to know if it could report a disagreement as to one or more of the defendants. The trial court never clarified his instructions and left the jury with the direction that it could not so report. This was erroneous and prejudicial.

For the reasons indicated the judgment is reversed and the case is remanded for new trial. Judgment reversed.

FARR and MIDDLETON, JJ, concur.